```
         IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
                  EASTERN DIVISION
```

AMERICAN AUTO GUARDIAN, INC.,     )
                                  )
        Plaintiff,                )
                                  )
   v.                             )   No.  06 C 6171
                                  )
ACUITY MUTUAL INSURANCE COMPANY,  )
                                  )
        Defendant.                )

MEMORANDUM OPINION AND ORDER

American Auto Guardian, Inc. ("American") seeks to recover, from its former insurer Acuity Mutual Insurance Company ("Acuity"), $313,282.01 that it sustained in employee dishonesty losses. Acuity counterclaims for a judgment declaring that it is free from any liability on American's claims. Each party seeks summary judgment on the coverage dispute under Fed. R. Civ. P. ("Rule") 56.

American's Complaint also contends that Acuity violated Illinois law by vexatious and unreasonable action or delay in handling its insurance claim. Citing issues of material fact on that score, American does not move for summary judgment on that allegation. Acuity, on the other hand, does believe that charge is ripe for disposition, and it accordingly moves for summary judgment.

For the reasons stated in this memorandum opinion and order, each side's motion for summary judgment on the coverage dispute

is granted in part and denied in part. As for the portion of Acuity's motion seeking summary judgment on American's vexatious handling claim, that aspect is denied because of Acuity's failure to present a fully developed argument.

<u>Summary Judgment Standard</u>

Every Rule 56 movant bears the burden of establishing the absence of any genuine issue of material fact (<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986)).  For that purpose courts consider the evidentiary record in the light most favorable to the nonmovant and draw all reasonable inferences in its favor (<u>Lesch v. Crown Cork & Seal Co.</u>, 282 F.3d 467, 471 (7th Cir. 2002)).  But to avoid summary judgment a nonmovant "must produce more than a scintilla of evidence to support his position" that a genuine issue of material fact exists (<u>Pugh v. City of Attica</u>, 259 F.3d 619, 625 (7th Cir. 2001)) and "must set forth specific facts that demonstrate a genuine issue of triable fact" (<u>id.</u>).

Cross-motions for summary judgment bring with them the added task of appropriately crediting the nonmovant's version of any disputed fact as to each motion.  Ultimately summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).  This Court, exercising subject matter jurisdiction predicated on diversity of citizenship, will apply Illinois substantive law to the current dispute (<u>Erie R.R. Co. v.

Tompkins, 304 U.S. 64 (1938)).

Background

From July 1, 2000 through July 12, 2005 American was insured against losses caused by employee dishonesty by six policies from two providers. General Casualty Insurance Company ("General Casualty") and Acuity issued three policies apiece (Am. St. ¶¶5-6; Acuity St. ¶¶3-5)[1]:

| Policy | Term |
|---|---|
| General Casualty Policy 1: | 7/01/2000 - 11/01/2000 |
| General Casualty Policy 2: | 11/01/2000 - 11/01/2001 |
| General Casualty Policy 3: | 11/01/2001 - 7/12/2002 |
| Acuity Policy 1: | 7/12/2002 - 7/12/2003 |
| Acuity Policy 2: | 7/12/2003 - 7/12/2004 |
| Acuity Policy 3: | 7/12/2004 - 7/12/2005 |

In early August 2005 American discovered that its Vice President of Accounting Sherri Kramer had been embezzling money by writing American checks payable to Bosley Design and Imaging (a defunct supplier) and depositing them into her husband's bank account (the "Bosley Design Scheme") (Am. St. ¶12; Acuity St. ¶2). On August 26, 2005 American sent Acuity notification of the losses incurred from the nine fraudulent checks it had then discovered (Am. St. ¶14; Acuity St. ¶11).

On October 19, 2005 American notified Acuity that it had completed its investigation into the Bosley Design Scheme and

---

[1] Each side's Statement of Undisputed Facts will be cited "St. ¶ --," preceded by "Am." or "Acuity" as appropriate. Each party's memoranda will be cited "Mem. --" with the same use of lead-ins.

uncovered 64 fraudulent checks totaling $285,264.22 issued from October 19, 2001 through June 24, 2005 (Am. St. ¶¶15-16; Acuity St. ¶13). Those checks were written during the policy periods covered by General Casualty Policies 2 and 3 and all three Acuity Policies (Am. St. ¶17). American discovered that Sherri Kramer had engaged in other dishonest acts from July 2001 through April 2005 that cost the company an additional $149,647.34 (Am. St. ¶¶24, 27). American's total claimed loss from Sherri Kramer's dishonest acts is $434,911.56.

In a February 20, 2006 letter Acuity sent American a payment of $49,783.46 covering losses from the five Bosley Design Scheme checks that had been issued in 2005 (Am. St. ¶18; Acuity St. ¶19). Acuity sent American an additional $71,846.09 on August 2, 2006 (Am. St. ¶29; Acuity St. ¶36). Those two payments covered all losses claimed during the Acuity Policy 3 period (Am. St. ¶29; Acuity St. ¶36). Acuity denied any further coverage for American's losses (Am. St. ¶29; Acuity St. ¶37), leaving American with the unpaid claim of $313,282.01 of loss now at issue.

Each of the Acuity policies contains a "discovery period provision" that limits coverage to losses that have occurred within the policy period and are discovered within one year of the end of the policy period (Acuity St. ¶3). While the General Casualty policies also contain that same discovery provision, they further state that no coverage will be provided for losses

4

discovered after a switch in insurance providers (regardless of whether such discovery occurs within one year of the policy period) (Am. St. ¶¶ 8-9).

Each Acuity policy also contains a "prior loss provision" that provides coverage for any loss suffered during a policy period before the current policy period, so long as the current policy became effective at the termination of the previous insurance policy and recovery of the loss is barred by the previous policy's discovery period provision (Acuity St. ¶3). General Casualty's policies contain a similar provision (Am. St. ¶9).

After a fresh reading of the policy, Acuity now admits liability for American's losses incurred because of Sherri Kramer's dishonest acts during Acuity Policy 2's coverage period (Acuity Mem. 12). For its part, American contends that the prior loss provisions put Acuity on the hook for all of the losses, including those incurred during the Acuity Policy 1 and General Casualty policy periods.

### Policy Coverage

Acuity does not dispute that Sherri Kramer's acts are the sort of employee dishonesty covered by the policies. This dispute, involving conflicting interpretations of insurance policy provisions, is a poster child for summary judgment. Acuity reads the policies to mean one thing, while American takes

a different view of the same language. Although uncertainties in insurance policies should be read in favor of the insured (Cent. Ill. Pub. Serv. Co. v. Allianz Underwriters Ins. Co., 240 Ill. App. 3d 598, 602, 608 N.E.2d 155, 157-58 (1st Dist. 1992)), unambiguous provisions are to be given their plain meaning (id.). Both the original Acuity policy and each of the Acuity policy renewals contain the following discovery period provision (Am. St. ¶10):

> 3. Employee Dishonesty
>
> * * *
>
> g. We will pay only for covered loss or damage discovered no later than one year from the end of the Policy Period.

American contends that the two annual renewals of the Acuity policy created a single three-year-long continuous policy, rather than three independent one-year policies. According to American, the effect of one continuous policy is that the discovery period for losses incurred during all three years would extend until one year after the termination of the final renewal period.

American's contention is at odds with scores of years of well-settled Illinois decisional law to the contrary.[2] In

---

[2] More ancient case law does evidence disagreement on that issue. More than eight decades ago Illinois Supreme Justice Floyd Thompson, in dissent, cited a trio of 19th century cases from that court holding that renewals of insurance contracts continue the original policy (Dickirson v. Pac. Mut. Life Ins. Co., 319 Ill. 311, 319, 150 N.E. 256, 259 (1925)):

> There being a right under this contract to keep it in

Illinois the "renewal of a policy is, in effect, a new contract of assurance, being, unless otherwise expressed, on the same terms and conditions as were contained in the original policy" (Dungey v. Haines & Britton, Ltd., 155 Ill. 2d 329, 334, 614 N.E.2d 1205, 1208 (1993), quoting Palmer v. Bull Dog Auto Ins. Ass'n, 294 Ill. 287, 291, 128 N.E. 499, 501 (1920)).

Though nearly a century old, this explanation in MacArthur v. United States. Health & Accident Ins. Co., 151 Ill. App. 507, 513 (1st Dist. 1909) has equal force in Illinois jurisprudence today:

> The policy involved, itself, does not purport to insure MacArthur against accidents beyond August 1, 1906. The original contract, by its own terms, expired absolutely on August 1, 1906. True, that original contract provided for renewals from time to time for such further periods or lengths of time, as payments of premiums, which the insured might make, would maintain the policy and insurance in force. But all renewals were optional with MacArthur and, also, as expressly stated, with the company. It is most elementary that there can be no contract without a meeting of the minds of parties. When the original contract expired, and, thereafter, at each expiration of a renewal, it became necessary for the minds of the parties to meet; otherwise there was here no renewal and, according to the expired contract, no insurance. Each renewal was in fact and in legal contemplation a new contract, not very formally made, it is true; but formality was unnecessary. At each renewal a receipt was given for the new premium. These receipts were something more

---

> force by the payment of an annual premium, the payment of the premium and the issue of the receipt did not make a new contract of insurance.

That line of reasoning survives today only as a historical footnote.

>       than mere receipts, for they expressed and evidenced
>       the terms of the new contract in so far as not
>       evidenced by the original expired contract.  Each
>       renewal involved as a new provision, to be agreed upon,
>       the length of time for the continuance of the new
>       contract.[3]

If there were any room for doubt on that score (and there is none), here is <u>Doe v. Ill. St. Med. Inter-Ins. Exch.</u>, 234 Ill. App. 3d 129, 137, 599 N.E.2d 983, 989 (1st Dist. 1992) (citations omitted):

>       [I]n Illinois, the renewal of an insurance policy is
>       generally conceived to be a new contract, particularly
>       where, as here, material and significant differences
>       exist, such as effective dates, increased premiums, and
>       the fact that the policy is conditioned upon new
>       representations by the insured as to his current
>       standing in his profession.

Just as in <u>MacArthur</u> and <u>Doe</u>, the Acuity policy renewals required the payment of a new premium for coverage during a new policy period.  Each renewal required payment of a higher premium than the preceding policy -- evidence of a fresh agreement.  None of the three Acuity policies is identical to the others -- endorsements are added and deleted from policy to policy.

In support of its theory of policy extension, American points to (1) the commonality of the policy number among the Acuity policies and (2) language of continuation in the cover

---

[3] Indeed, that reasoning applies a fortiori to the more modern practice (as evidenced here) of formally issuing new self-contained policies (often containing changes in coverage), rather than simply issuing receipts for renewal premiums.

letters and policies.[4] Those items fail to overcome the creation of three different policies, including some different provisions, for three discrete policy periods. If the renewals were meant only to continue the existing coverage, simply extending the termination date would have been sufficient. Instead each renewal carved out a distinct one year period of effectiveness. Coupled with the increased premiums and alterations in policy terms, the Acuity renewals created separate contracts under Illinois caselaw.

Each of the Acuity policies covered a distinct policy period, and the termination of each policy period started a new one-year discovery period ticking. Sherri Kramer's dishonest acts were discovered by American in August 2005. At that time only the Acuity Policy 3 discovery period remained open. Hence

---

[4] As part of the Common Policy Provisions, the Acuity policies state (Am. St. ¶10):

> I. Premium
> ***
> 3. With our consent, you may continue this policy in force by paying a continuation premium for each successive one year period.
> ***
> Our forms then in effect will apply. If you do not pay the continuation premium, this policy will expire on the first anniversary date that we have not received the premium.

Each of the cover letters that accompanied the Acuity renewal policies begins (Am. St. ¶11):

> This renewal policy continues your business coverage under the Comco Commercial Insurance Program.

the dishonesty losses are recoverable only under that policy.

### Prior Loss Provision

Acuity Policy 3, like the earlier Acuity and General Casualty policies, contains a prior loss provision that makes recoverable some losses incurred before the effective date of the policy coverage (Acuity St. ¶6):

> 3. Employee Dishonesty
>
> * * *
>
> h. If you (or any predecessor in interest) sustained loss or damage during the period of any prior insurance that you could have recovered under that insurance except that the time within which to discover loss or damage had expired, we will pay for it under this Optional Coverage, provided:
>
> (1) This Optional Coverage became effective at the time of cancellation or termination of the prior insurance; and
>
> (2) The loss or damage would have been covered by this Optional Coverage had it been in effect when the acts or events causing the loss or damage were committed or occurred.

Acuity concedes that the prior loss provision operates to make losses incurred during the term of Acuity Policy 2 recoverable under Acuity Policy 3 (Acuity Mem. 12), while American argues that the string of prior loss provisions contained in the policies renders the entirety of the loss recoverable.  American's misreads the policy language: Acuity Policy 3's "Optional Coverage became effective" only "at the time of...termination of" Acuity Policy 2 ("the prior insurance"), so

10

that American's "sustained loss or damage during the period of any prior insurance that [it] could have recovered under that insurance" relates only to loss sustained during the period of Acuity Policy 2 (July 12, 2003 to July 12, 2004).

Of course Acuity Policy 2 contains its own prior loss provision, but any losses recoverable under that provision did not occur during Acuity Policy 2's effective period. Only losses that actually occurred during the term of Acuity Policy 2 are made recoverable by Acuity Policy 3's prior loss provision. It would be anomalous for Acuity Policy 2's discovery period provision to bar (as it does) the recovery of losses that occurred during its own term but were discovered more than a year later, and then in the next breath, by way of its period loss provision, to make recoverable losses that occurred even earlier (say during the term of Acuity Policy 1, to say nothing of the periods covered by the even earlier General Casualty policies). American's effort to extend recovery backward by cobbling together prior loss provisions calls for a wholly illogical reading of the policies.

Neither the litigants nor this Court have located Illinois decisional authority germane to the operation of the prior loss provisions. Each side cites non-Illinois decisions in purported support of its reading. But on analysis those decisions, viewed as potentially advisory authority, carry no persuasive force in

11

terms of the facts at hand.

Thus American seeks to call to its aid the decisions in Cincinnati Ins. Co. v. Hopkins Sporting Goods, Inc., 522 N.W.2d 837 (Iowa 1994) and Universal Underwriters Ins. Co. v. Ford, 734 So.2d 173 (Miss. 1999). Neither helps its cause.

Cincinnati dealt with only two policies and held that a prior loss provision provides coverage for losses incurred in the immediately preceding policy period once the time for discovery under that policy has lapsed. But Acuity has already conceded as much here, and Cincinnati did not (because it did not have to) deal with the multiyear multipolicy situation posed by this case.

Then Universal, citing Cincinnati, held that ambiguity was created by a conflict between a policy's prior loss provision and its discovery period provision, so that the ambiguity had to be construed in the insurer's favor.[5] But this Court disagrees with the notion that the coexistence of the discovery period provision and the prior loss provision in the policy creates a recipe for ambiguity.[6] Those provisions do not operate at cross-purposes,

---

[5] Just as with other contracts, ambiguity is present in insurance policies if the provisions are subject to more than one reasonable construction (Dungey v. Haines & Britton, Ltd., 155 Ill. 2d 329, 336, 614 N.E.2d 1205, 1209 (1993)).

[6] This is quite apart from the meaningful difference between the prior loss provision in the Universal policy and the provision at issue here.

for both can be given full effect.[7]

On the other side of the coin, Acuity points to <u>Winthrop & Weinstine, P.A. v. Travelers Cas. & Sur. Co.</u>, 187 F.3d 871 (8th Cir. 1999) and <u>Armbrust Int'l, Ltd. v. Travelers Cas. & Sur. Co.</u>, No. C.A. 04-212 ML, 2006 WL 1207659 (D.R.I. May 1, 2006). Even apart from its nonprecedential force, <u>Armbrust</u> is clearly inapropos because application of the prior loss provision was rejected there on the ground that the effective dates of the policies overlapped (not the case here). As for <u>Winthrop & Weomsteom</u>, the factual pattern was materially different from the situation posed by this case -- but more importantly, the Eighth Circuit's decision (applying Minnesota laws) was entirely consistent with the policy reading arrived at by this Court.

In sum, Acuity Policy 3 covered losses incurred only during its own effective dates and the effective dates of the policy immediately preceding it (Acuity Policy 2). Those losses are the only ones as to which Acuity must indemnify American. Hence each party's motion for summary judgment is granted in part and denied in part.

<u>Vexatious and Unreasonable Actions or Delay</u>

American also asserts, in what it styles as Complaint Count

---

[7] Whenever possible, policy provisions should be read in concord to effect meaning to the entirety of the policy (<u>Valley Forge Ins. Co. v. Swiderski Elecs., Inc.</u>, 223 Ill.2d 352, 363, 860 N.E.2d 307, 314 (2006)).

13

II, that Acuity violated Section 155 of the Illinois Insurance Code ("Section 155," 215 ILCS 5/155) by vexatiously refusing to pay American's claim (Compl. ¶¶29-32). Acuity seeks summary judgment in its favor on that allegation. Here is the relevant statutory provision:

> (1) In any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees, other costs, plus an amount not to exceed any one of the following amounts:
>
> (a) 60% of the amount which the court or jury finds such party is entitled to recover against the company, exclusive of all costs;
>
> (b) $60,000;
>
> (c) the excess of the amount which the court or jury finds such party is entitled to recover, exclusive of costs, over the amount, if any, which the company offered to pay in settlement of the claim prior to the action.

American responds that the presence of disputed issues of material fact regarding its allegation of vexatious delay renders summary judgment inappropriate. And it is certainly true that Acuity does has not addressed that issue in its totality -- its memorandum speaks only to whether its "initial" denial of coverage for losses incurred during the Acuity Policy 2 period[8]

---

[8] Although Acuity has now admitted its responsibility to cover losses incurred during Acuity Policy 2 period--thereby

qualifies as actionably vexatious or unreasonable.[9]  American's relevant allegations against Acuity include (a) its failure to pay for the four Bosley Design Scheme checks issued during Acuity Policy Period 3 for 11 months, (b) its unreasonable construction of the policy language to deny coverage, (c) its failure to acknowledge American's communications (three requests for a coverage explanation and one request for reconsideration that directly precipitated this lawsuit) and (d) its having compelled American to file this suit to recover for its losses despite Acuity's clear liability (Compl. ¶31).

Acuity's delayed recognition of coverage for the losses incurred during Acuity Policy Period 2 makes up but a small portion of American's allegations of vexatious and unreasonable action or delay in violation of Section 155(1).  Acuity's summary judgment motion leaves a lot of American's allegations unchallenged.  Such undeveloped arguments are deemed waived -- more accurately, forfeited (United States v. Berkowitz, 927 F.2d 1376, 1384 (7th Cir. 1991).  Acuity's underdeveloped motion for

---

rendering its denial of coverage "initial"--it has yet to pay for those losses.  Nothing in this litigation has precluded Acuity from an earlier acknowledgment of its liability for -- and its prompt payment of -- the losses incurred during the period covered by Acuity Policy 2.

[9] Indeed, the portion of Acuity's memorandum dealing with the Complaint is labeled "Acuity did not act in bad faith in initially incorrectly denying coverage under the second Acuity policy period" (Acuity Mem. 12).

summary judgment must be denied.

This Court would be remiss, however, if it did not remark on the lack of persuasiveness it finds in the portion of American's Section 155 claim that Acuity's Rule 56 effort <u>did</u> address: that relating to its nonpayment of losses sustained during the Acuity Policy 2 period. Acuity seeks to support such nonpayment on the existence of an asserted bona fide dispute with American -- yet this Court's reading of the prior loss provision that has brought Acuity Policy 2 into play coincides with that advanced <u>by Acuity itself</u> in its Mem. 7-12.[10] It is frankly difficult to see any justification for Acuity's having resisted or delayed payment of that portion of American's claim. On what ground -- its failure to have done its legal homework?[11]

## Conclusion

Acuity advocates the correct reading of the policies, under which it must cover only the losses incurred during the two years during which Acuity Policies 2 and 3 were in force. Acuity must

---

[10] Acuity says that its coverage counsel originally read the prior loss provisions as referring to previous carrier General Casualty -- but its Mem. 14 admits that it reexamined the clause when it received American's August 29, 2006 letter that in part cited the <u>Cincinnati</u> case. It then uses the filing of this lawsuit less than two months later as somehow explaining its nonpayment once its corporate eyes were opened -- in candor, a total non sequitur.

[11] Thus Mem. 7 characterizes the <u>Winthrop v. Weinstine</u> decisions as "on all fours with this case" in that respect.

16

forthwith pay $110,893.71 to cover the balance of those losses.[12] Because no issue of material fact exists on the coverage issue, each side's motion for summary judgment has been granted in part and denied in part.

Acuity's motion for summary judgment on American's allegation of vexatious activity in connection with its insurance claim is denied, both because Acuity's underdeveloped presentation does not meet the entire subject head on and because its attempted justification on the aspect that it does seek to develop leaves much to be desired. Because that is the only remaining issue in this litigation, a status hearing is set for 9 a.m. May 8, 2008 to discuss the procedure and timing for resolving that issue.

                                               _____
                                               Milton I. Shadur
                                               Senior United States District Judge

Date: April 30, 2008

---

[12] This figure is arrived at by adding the Bosley Design Scheme losses ($50,821.12) and the other losses ($60,072.59) incurred during the Acuity Policy 2 coverage period (Am. St. ¶¶17, 27). Losses incurred during the Acuity Policy 3 coverage period have already been paid.